This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-37443**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**RAFAEL GONZALEZ-PARRA,**
**a/k/a RAFAEL GONZALES-PARRA**
**a/k/a RAFAEL ORTIZ GONZALEZ,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Alisa A. Hart, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
John Kloss, Assistant Attorney General
Albuquerque, NM

for Appellee

Stalter Law LLC
Kenneth H. Stalter
Albuquerque, NM

for Appellant

## MEMORANDUM OPINION

**HANISEE, Chief Judge.**

**{1}** Rafael Gonzalez-Parra (Defendant) appeals from his convictions of second-degree murder (firearm enhancement), contrary to NMSA 1978, Section 30-2-1(B) (1994), first-degree kidnapping (firearm enhancement), contrary to NMSA 1978, Section 30-4-1(A) (2003), and conspiracy to commit kidnapping, contrary to NMSA 1978,

Sections 30-28-2 (1979) and 30-4-1(A). On appeal, Defendant argues there was insufficient evidence to support his convictions, and the district court erred in failing to order a separate trial for Defendant from that of his co-defendants, Eder Ortiz-Parra and Edwin Ortiz-Parra. We affirm.

## BACKGROUND

**{2}** On the evening of August 8, 2016, Defendant met Carlos Almazan-Avila and co-defendants for dinner at a food truck in southeast Albuquerque. After dinner, Defendant drove his Ford Taurus, with Almazan-Avila as his passenger, and followed the co-defendants, driving a Dodge Charger, to a nearby house, which was approximately a five-minute drive from where they met for dinner. The co-defendants told Almazan-Avila that they wanted to "talk to a guy" at the house. When the four men arrived at the house, there was a car in the driveway which co-defendants parked behind, preventing it from leaving. There were four people in the car in the driveway: Daniel Chumacero (Victim), Mirna Rodriguez-Gutierrez, Victim's girlfriend, and Rodriguez-Gutierrez's two children. Witnesses offered conflicting evidence as to who was directly involved in getting Victim out of the car, but one witness's testimony established that the co-defendants removed Victim from his car and brought Victim inside the house, leaving Rodriguez-Gutierrez and the children alone in the vehicle. While the co-defendants escorted Victim into the house, Defendant and Almazan-Avila approached the passenger side of the car blocked in the driveway and asked Rodriguez-Gutierrez for her phone. While conflicting evidence was presented regarding whether it was Defendant or Almazan-Avila who initially asked for Rodriguez-Gutierrez's phone, Almazan-Avila testified that he took possession of the phone after their interaction with Rodriguez-Gutierrez. Next, Defendant and Almazan-Avila headed towards the house after the co-defendants, but before they reached the front door they heard multiple gunshots coming from inside the house. After Defendant and Almazan-Avila heard the gunshots, the co-defendants ran out of the house, guns in hand, fleeing the scene in the Charger, and Defendant and Almazan-Avila likewise fled in Defendant's Taurus. Defendant then dropped off Almazan-Avila at his house, and Almazan-Avila testified that on their way there, the two talked about how neither of them knew "what it was [the co-defendants] were going to do." Victim was pronounced dead at the scene. Defendant was subsequently arrested on March 22, 2017, and a jury trial for Defendant and co-defendants commenced on February 20, 2018.[1] Prior to trial, Defendant moved to sever his trial from that of the co-defendants, and the district court denied his motion.

## DISCUSSION

---

[1] Our Supreme Court recently affirmed the convictions and sentences of the co-defendants who were each convicted of the following: two counts of first-degree, willful and deliberate murder, contrary to Section 30-2-1(A)(1); one count of conspiracy to commit first-degree murder, contrary to Section 30-28-2 and Section 30-2-1(A)(1); one count of kidnapping with a firearm enhancement, contrary to Section 30-4-1 and NMSA 1978, Section 31-18-16 (1993, amended 2020); and two counts of attempted first-degree willful and deliberate murder with firearm enhancements, contrary to NMSA 1978, Section 30-28-1 (1963) and Section 30-2-1(A)(1). *State v. Ortiz-Parra*, No. S-1-SC-37109, dec. ¶¶ 1-2 (N.M. Sup. Ct. May 28, 2020) (non-precedential); *State v. Ortiz-Parra*, No. S-1-SC-37093, dec. ¶¶ 1, 5, 43 (N.M. Sup. Ct. May 28, 2020) (non-precedential).

## I.      Sufficient Evidence Supports Defendant's Convictions

**{3}**      Defendant argues there was insufficient evidence to support his convictions for second-degree murder, kidnapping, and conspiracy to commit kidnapping, specifically contending that the State only presented evidence that Defendant was "present outside the house when the shootings occurred." "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Montoya*, 2015-NMSC-010, ¶ 52, 345 P.3d 1056 (internal quotation marks and citation omitted). We "view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. We disregard all evidence and inferences that support a different result. *See State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. "Our appellate courts will not invade the jury's province as fact-finder by second-guessing the jury's decision concerning the credibility of witnesses, reweighing the evidence, or substituting its judgment for that of the jury." *State v. Gwynne*, 2018-NMCA-033, ¶ 49, 417 P.3d 1157 (internal quotation marks and citation omitted).

**{4}**      "The jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." *State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409 (alterations, internal quotation marks, and citation omitted). Before addressing the specific jury instructions for each of the crimes for which Defendant was charged and convicted, we note that the jury was additionally instructed on accessory liability, which specified that Defendant could be "found guilty of a crime even though [D]efendant *did not do the acts constituting the crime*," so long as the jury found that (1) "[D]efendant intended that another person commit the [charged] crime[s]"; (2) "[a]nother person committed the crime[s]"; and (3) "[D]efendant helped, encouraged, or caused the crime[s] to be committed." (Emphasis added.) This instruction is central to our resolution of Defendant's appeal, given that the State presented no evidence that Defendant, himself, directly committed any of the charged crimes. Our review, then, focuses on the sufficiency of the evidence supporting Defendant's convictions as an *accessory* to the events that transpired.

**{5}**      Per its instructions, in order to convict Defendant of second-degree murder, the jury had to find under an accessory theory of liability that: (1) "[D]efendant killed [Victim]"; (2) "[D]efendant knew that his acts created a strong probability of death or great bodily harm to [Victim] or any other human being"; and (3) "[D]efendant did not act as a result of sufficient provocation[.]" The State presented evidence through witness testimony that, while conflicting in some respects, established the following: (1) Defendant met the co-defendants and Almazan-Avila prior to following the co-defendants to the nearby house where they eventually found Victim in the driveway; (2) Defendant, along with Almazan-Avila, approached the passenger side of Victim's vehicle where they retrieved Rodriguez-Gutierrez's phone; (3) according to Rodriguez-Gutierrez's testimony, four people, who were armed with two guns, "showed up and told [Victim] to get out" of the car parked in the driveway; (4) Defendant along with the co-

defendants escorted Victim from the car to the house where gunfire soon erupted; (5) Defendant fled the scene with Almazan-Avila and co-defendants; and (6) as a result of gunshot wounds, Victim died.

**{6}** Recognizing that conflicting testimony was presented at trial—namely that Rodriguez-Gutierrez testified that four individuals approached the vehicle in the driveway and that all three except Almazan-Avila escorted Victim into the house while Almazan-Avila testified that both he and Defendant approached the vehicle in the driveway while only the co-defendants escorted Victim out of the car and into the house—we emphasize that "[c]onflicts in the evidence, even within the testimony of a witness, are to be resolved by the fact[-]finder at trial." *State v. Jason L.*, 2000-NMSC-018, ¶ 10, 129 N.M. 119, 2 P.3d 856. Based on the testimony presented, even if a jury were to believe that Defendant was *not* inside the house during the shootings, a jury could reasonably infer from testimony that Defendant intended that co-defendants kill Victim and that Defendant "helped, encouraged, or caused" such killing to occur. *See State v. Duran*, 2006-NMSC-035, ¶ 7, 140 N.M. 94, 140 P.3d 515 ("Intent is subjective and is almost always inferred from other facts in the case, as it is rarely established by direct evidence." (internal quotation marks and citation omitted)); *Rojo*, 1999-NMSC-001, ¶ 19 ("Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [an alternative] version of the facts."). To this end, the jury was presented with testimony that Defendant arrived at the house where the murder took place along with the co-defendants who shot Victim, assisted in removing Victim from the car he was in and blocking that car from departing the driveway, assisted in acquiring Rodriguez-Gutierrez's phone—the means by which she might have alerted law enforcement to the events she witnessed—and was either inside or proceeding into the house when the fatal shots were fired. As well, Defendant immediately fled the premises along with the co-defendants and Almazan-Avila. On this record, we conclude that Defendant's conviction for second-degree murder was supported by sufficient evidence.

**{7}** A similar analysis follows regarding Defendant's convictions of kidnapping and conspiracy to commit kidnapping. In order to convict Defendant of kidnapping, the jury had to find that (1) "[D]efendant took [Victim] by force, intimidation, or deception; by ordering him out of his car and walking him into the residence"; (2) "[D]efendant's act was unlawful"; (3) "[D]efendant intended to inflict death or physical injury on [Victim]"; (4) "[t]he taking of [Victim] was not slight, inconsequential, or merely incidental to the commission of . . . second[-]degree murder"; and (5) "[D]efendant inflicted physical injury upon [Victim] during the course of the kidnapping[,]" again under an accessory liability theory. Our review, then, focuses on whether the State presented sufficient evidence that Defendant intended as an accessory for co-defendants to take Victim by force, intimidation, or deception and helped, encouraged, or caused the crimes to be committed.

**{8}** To reiterate, the jury heard testimony that Defendant, along with co-defendants, extracted Victim from the car and escorted him into the house immediately prior to the shootings. The jury also heard, however, that Defendant stayed outside with Almazan-

Avila, approaching the vehicle in the driveway and gaining possession of Rodriguez-Gutierrez's phone while the co-defendants escorted Victim inside. Again, the conflicting nature of such testimony is inconsequential for the purpose of our analysis. *See Jason L.*, 2000-NMSC-018, ¶ 10. We conclude that Defendant's role was no less instrumental in accomplishing the kidnapping than his co-defendants, even if their guilt is derived from direct action. Evidence was presented that Defendant participated directly in the removal of Victim from his car after it had been blocked in the driveway. Defendant then either went in the house, when Victim was taken by force, or assisted in depriving Rodriguez-Gutierrez of the means by which she could communicate with law enforcement. Emphasizing that intent is subjective and may be inferred from other facts, we conclude that the evidence was sufficient to support Defendant's conviction of kidnapping. *Rojo*, 1999-NMSC-001, ¶ 19.

**{9}** Finally, in order to convict Defendant of conspiracy to commit kidnapping, the jury had to find that (1) "[D]efendant and another person by words or acts agreed together to commit kidnapping"; and (2) "[D]efendant and the other person intended to commit kidnapping[.]" At trial, the jury heard testimony from Almazan-Avila that prior to meeting Defendant for dinner at the food truck, the co-defendants visited Almazan-Avila at his home and asked him to accompany them later to "go talk to some guys." Almazan-Avila testified that he agreed to go with the co-defendants, despite not knowing why they wanted him to accompany them. The co-defendants drove Almazan-Avila to the food truck where they would eventually meet Defendant. When asked whether meeting Defendant at the food truck was planned, Almazan-Avila responded, "I think [the co-defendants] had . . . spoken to [Defendant] about [meeting] there," and testified that it did not seem like a coincidence that Defendant met them at the food truck. Almazan-Avila also testified, however, that after the shootings, he and Defendant told each other that neither of them knew "what [the co-defendants] were going to do."

**{10}** "Conspiracy consists of knowingly combining with another for the purpose of committing a felony[.]" Section 30-28-2(A). "An overt act is not required and the crime of conspiracy is complete when the felonious agreement is reached. The jury may therefore infer the existence of an agreement based on the defendant's conduct and surrounding circumstances." *State v. Torres*, 2018-NMSC-013, ¶ 50, 413 P.3d 467 (internal quotation marks and citations omitted). "Conspiracy is seldom susceptible of direct proof and is usually established by inference from the conduct of the parties. A formal agreement need not be proved; a mutually implied understanding is sufficient to establish the conspiracy." *Id.* (internal quotation marks and citation omitted).

**{11}** Under these standards, and despite evidence to the contrary, a jury could reasonably infer that Defendant had an agreement with the co-defendants to join them at the food truck and accompany them to the house where Victim was killed. Such evidence may be sufficient on its own to support Defendant's conviction of conspiracy to commit kidnapping, but two pieces of testimony, albeit contradictory, further demonstrate the sufficiency of the evidence presented: Rodriguez-Gutierrez testified that Defendant joined co-defendants in escorting Victim out of the car and into the house, and Almazan-Avila testified, to the contrary, that when the co-defendants

escorted Victim out of the car and into the house, Defendant stayed outside of the house with Almazan-Avila while the two took possession of Rodriguez-Gutierrez's phone prior to the shootings. Despite the contradictions therein, either of these two pieces of evidence could allow a reasonable juror to infer that Defendant and co-defendants, by words or acts, agreed together to kidnap Victim, and that Defendant and co-defendants intended to kidnap Victim because, again, even the act of taking Rodriquez-Gutierrez's phone could be viewed as an attempt to prevent her from calling the authorities. *See Rojo*, 1999-NMSC-001, ¶ 19 ("Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [an alternative] version of the facts."); *see also Torres*, 2018-NMSC-013, ¶ 50 ("A formal agreement need not be proved; a mutually implied understanding is sufficient to establish the conspiracy." (internal quotation marks and citation omitted)); *Duran*, 2006-NMSC-035, ¶ 7 ("Intent is subjective and is almost always inferred from other facts in the case, as it is rarely established by direct evidence." (internal quotation marks and citation omitted)). We therefore hold that sufficient evidence supported Defendant's convictions.

## II. The District Court Did Not Err in Denying Defendant's Motion to Sever

**{12}** Defendant argues the district court erred in denying Defendant's motion to sever. We review the denial of a motion for severance for abuse of discretion. *State v. Armijo*, 1997-NMCA-080, ¶ 7, 123 N.M. 690, 944 P.2d 919. "Even when the trial court abuses its discretion in failing to sever charges, appellate courts will not reverse unless the error actually prejudiced the defendant." *State v. Gallegos*, 2007-NMSC-007, ¶ 18, 141 N.M. 185, 152 P.3d 828.

**{13}** Defendant contends that because Defendant and co-defendants had conflicting defenses, the district court should have granted Defendant's motion to sever. "To obtain a severance on the grounds of conflicting defenses between co-defendants, it must be demonstrated that the conflict is so prejudicial that the defenses are irreconcilable and the jury will unjustifiably infer that the conflict alone demonstrates the guilt of both." *State v. Segotta*, 1983-NMCA-054, ¶ 32, 100 N.M. 18, 665 P.2d 280, *rev'd on other grounds*, 1983-NMSC-092, 100 N.M. 498, 672 P.2d 1129. "Separate trials are required only when the defenses of the defendants are so antagonistic that a fair trial can be assured only by a severance and defendants are deprived of the opportunity to present effective defenses." *Id.* "The mere fact that one defendant seeks to escape conviction by placing guilt upon a co-defendant, however, is not sufficient grounds for a severance." *Id.*

**{14}** Defendant's briefing on this issue focuses solely on the testimony of Almazan-Avila, asserting that such testimony "was the State's case," as Almazan-Avila was the only witness to identify the co-defendants and Defendant by sight. Defendant argues that because Almazan-Avila's testimony "inculpated" the co-defendants while "exculpating" Defendant, all three defendants were "forced . . . to pursue conflicting defenses[,]" and further contends that "[b]ecause the jury lacked evidence from which to infer [Defendant's] guilt, it must have improperly relied on the inconsistencies in defense

theories." We disagree. Defendant fails to account for Rodriguez-Gutierrez's testimony, which—along with Almazan-Avila's—provided evidence from which we already held that the jury could reasonably infer Defendant's guilt. Further, Defendant fails to specify how he was actually prejudiced by the district court's denial of his motion to sever. *See Gallegos*, 2007-NMSC-007, ¶ 18; *see also State v. Garcia*, 2011-NMSC-003, ¶ 16, 149 N.M. 185, 246 P.3d 1057 ("Defendant bears the burden of establishing that he was actually prejudiced by a failure to sever."). While Defendant's briefing expounds upon the problematic implications of defendants who face conflicting defenses at a joint trial, Defendant fails to specify how he was actually prejudiced by the district court's denial of his motion to sever, and we will not assume such arguments for him. *See Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("We will not review unclear arguments, or guess at what a party's arguments might be." (alteration, internal quotation marks, and citation omitted)). Moreover, even though Almazan-Avila's testimony suggested that the co-defendants fired the fatal bullets, such does not render Almazan-Avila's testimony exculpatory to Defendant. Rather, under the State's theory of accessory liability, the testimony incriminated Defendant along with the co-defendants. Consequently, at best Defendant is left with a circumstance where he sought to direct guilt upon the co-defendants, a defense which is not irreconcilable to the degree that mandates severance. *Segotta*, 1983-NMCA-054, ¶ 32. Accordingly, we cannot conclude the district court abused its discretion in denying Defendant's motion to sever.

**CONCLUSION**

**{15}**   For these reasons, we affirm Defendant's convictions.

**{16}   IT IS SO ORDERED.**

**J. MILES HANISEE, Chief Judge**

**WE CONCUR:**

**KRISTINA BOGARDUS, Judge**

**JACQUELINE R. MEDINA, Judge**